IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIFFANY A. ARMSTRONG, | : | |
| | : | |
| Plaintiff | : | CIVIL NO. 1:13-CV-00430 |
| | : | |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Rambo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## Background

The captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying in part Plaintiff Tiffany A. Armstrong's claim for supplemental security income benefits.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind, or other disabled individuals who have little or no income.

Armstrong protectively filed[1] her application for supplemental security income benefits on August 11, 2009. Tr. 30, 71, 148-158 and 182.[2] Armstrong alleged that she was disabled as the result of the residual effects of a gunshot wound to the upper torso and depression. Tr. 55-63 and 165.  The application was initially denied by the Bureau of Disability Determination on March 3, 2010.[3]  Tr. 30 and 74-77. On March 18, 2010, Armstrong requested a hearing before an administrative law judge. Tr. 30 and 87-88.  A hearing was held before an administrative law judge on April 5, 2011, at which Armstrong was not represented. Tr. 30 and 46-67.  On April 15, 2011, the administrative law judge issued a decision granting in part and denying in part

_____

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on April 24, 2013.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration.  Tr. 74.

Armstrong's application. Tr. 30-41. The administrative
law judge found that Armstrong was disabled from June
14, 2009 through June 14, 2010, but that she medically
improved on June 15, 2010, and consequently, was not
entitled to benefits on and after that date. Tr. 36-41.
On May 25, 2011, Armstrong filed a request for review
with the Appeals Council.  Tr. 24. The request for
review was initially denied by the Appeals Council on
August 26, 2011. Tr. 14-16. On November 23, 2011,
Armstrong filed with the Appeals Council a request to
vacate that denial because counsel who entered an
appearance on behalf of Armstrong subsequent to the
administrative law judge's decision was not provided
with copies of the hearing transcript and exhibits or
given an opportunity to submit a brief. Tr. 236-237.
Subsequently, on May 10, 2012, counsel submitted a brief
and, on December 18, 2012, the Appeals Council set aside
its earlier decision and considered counsel's brief but
ultimately found that there was no basis upon which to
grant Armstrong's request for review. Tr. 1-4 and 241-

246. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Armstrong then filed a complaint in this court on February 18, 2013.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on January 31, 2014, when Armstrong filed a reply brief.

Armstrong, who was born in the United States on September 12, 1978, graduated from high school in 1995 and can read, write, speak, and understand the English language. Tr. 54, 63, 164 and 169.  During her elementary and secondary schooling, Armstrong attended regular education classes. Tr. 169.

Armstrong has a limited work and earnings history. Tr. 160 and 172. The records of the Social Security Administration reveal that Armstrong had earnings in the years 1994 through 1997, 2000, 2002, 2003, 2005 and 2006. Tr. 160.  Armstrong's annual

---

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

earnings range from a low of $33.75 in 2002 to a high of $2,121.22 in 2005. Id.  Armstrong's total earnings during those 8 years were $6,765.31. Id.

The administrative law judge found that Armstrong had no employment that rose to the level of substantial gainful activity, and consequently, no past relevant employment.[5]  Tr. 56.  The vocational expert, however, identified Armstrong's past work as: (1) a cashier described as unskilled, light work; (2) a delivery person described as unskilled, medium work; (3) a waitress described as semiskilled, light work; (4) a cosmetologist described as skilled, light work; (5) a daycare worker described as semiskilled, light work; and

---

5.  Past relevant employment in the present case means work performed by Armstrong during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant employment, the work must, inter alia, amount to substantial gainful activity. Pursuant to Federal Regulations, a person's earnings have to rise to a certain level to be considered substantial gainful activity.  The official website of the Social Security Administration reveals that, from 1994 through 1998, the amount necessary to be considered substantial gainful employment was $500.00 per month ($6,000.00 per year)and periodically increased thereafter. Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed October 9, 2014).

(6) a housekeeper described as unskilled, light work.[6]

————————————

6.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(continued...)

Tr. 63.  Armstrong's last employment was for a company that delivered bags of ice to various businesses in Atlanta, Georgia. Tr. 54 and 166.

The record reveals that on the evening of June 14, 2009, Armstrong was offered a ride to her boyfriend's apartment located in the Atlanta, Georgia area. Tr. 787.  During this ride, an unknown assailant riding in another motor vehicle fired multiple rounds from an AK-47 assault rifle at the vehicle in which Armstrong was a passenger in the back seat. Id. Bullets entered through the rear window of the motor vehicle striking Armstrong twice in the back between the

---

6.  (...continued)

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 416.967.

left shoulder blade and the spine. Id.  Armstrong was hospitalized for approximately two months and then was transferred to a nursing home where she received rehabilitation therapy. Tr. 247-249 and 754-770.  She was discharged from the nursing home on September 18, 2009, and shortly thereafter moved to Pennsylvania to live with her mother. Id.  Armstrong has not worked since the shooting. Tr. 165.

In a document entitled "Disability Report - Appeal" dated March 16, 2010, when asked to describe her condition, Armstrong stated that she had a great deal of weakness on her left side and could barely move her left arm or coordinate the movements of her fingers; and that she reported weakness in her left leg and difficulty with balance, shortness of breath with minimal exertion, an inability to stand for any length of time, muscle spasms and weakness in her knees and ankles, and that she suffered from back and chest pain. Tr. 224. Armstrong also reported problems with her gait, needing help with bathing, combing her hair, dressing and undressing, and getting in and out of bed. Tr. 228.  At

the administrative hearing on April 5, 2011, Armstrong reiterated many of these complaints. Tr. 58-63. Additionally, in response to a question from the administrative law judge, Armstrong stated that she was taking Percocet four times per day for pain which "makes her tired, [] sleepy, drowsy the majority of the day." Tr. 64.

Armstrong's alleged disability onset date of June 14, 2009, has no impact on Armstrong's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501. Consequently, Armstrong is not eligible for SSI benefits for any period prior to September 1, 2009.

Because there were legal errors committed during the administrative proceedings, as delineated below, the court will remand this case to the Commissioner for further consideration.

## Standard of Review

When considering a social security appeal, we
have plenary review of all legal issues decided by the
Commissioner.  See Poulos v. Commissioner of Soc. Sec.,
474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v.
Commissioner of Soc. Sec. Admin.,  181 F.3d 429, 431 (3d
Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858
(3d Cir. 1995).  However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. §
405(g) is to determine whether those findings are
supported by "substantial evidence."  Id.; Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v.
Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual
findings which are supported by substantial evidence
must be upheld. 42 U.S.C. §405(g); Fargnoli v.
Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the
ALJ's findings of fact are supported by substantial
evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently.");
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir.
1981)("Findings of fact by the Secretary must be
accepted as conclusive by a reviewing court if supported

by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

11

substantial evidence." <u>Consolo v. Federal Maritime</u> <u>Comm'n</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate.  Id.

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be

expected to result in death or which has lasted or can

be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be
> under a disability only if his physical or
> mental impairment or impairments are of such
> severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any
> other kind of substantial gainful work which
> exists in the national economy, regardless of
> whether such work exists in the immediate area
> in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of
> the preceding sentence (with respect to any
> individual), "work which exists in the
> national economy" means work which exists in
> significant numbers either in the region where
> such individual lives or in several regions of
> the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in

evaluating supplemental security income claims. See 20

C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This

process requires the Commissioner to consider, in

14

sequence, whether a claimant: (1) is engaging in
substantial gainful activity[7]; (2) has an impairment that
is severe or a combination of impairments that is
severe[8]; (3) has an impairment or combination of

_____

7.  If the claimant is engaging in substantial gainful
activity, the claimant is not disabled and the
sequential evaluation proceeds no further. Substantial
gainful activity is work that "involves doing
significant and productive physical or mental duties"
and "is done (or intended) for pay or profit." 20
C.F.R. § 416.910.

8.  The determination of whether a claimant has any
severe impairments, at step two of the sequential
evaluation process, is a threshold test. 20 C.F.R. §
416.920(c). If a claimant has no impairment or
combination of impairments which significantly limits
the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id. If a
claimant has any severe impairments, the evaluation
process continues.  20 C.F.R. § 416.920(d)-(g).
Furthermore, all medically determinable impairments,
severe and non-severe, are considered in the subsequent
steps of the sequential evaluation process.  20 C.F.R.
§§ 416.923 and 416.945(a)(2). An impairment
significantly limits a claimant's physical or mental
abilities when its effect on the claimant to perform
basic work activities is more than slight or minimal.
Basic work activities include the ability to walk,
stand, sit, lift, carry, push, pull, reach, climb,
crawl, and handle. 20 C.F.R. § 416.945(b).  An
individual's basic mental or non-exertional abilities
include the ability to understand, carry out and

(continued...)

impairments that meets or equals the requirements of a listed impairment[9]; (4) has the residual functional capacity to return to his or her past work; and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[10]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing

---

8.  (...continued)
remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

9.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

10.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## Medical Records

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Armstrong's medical records.

On June 14, 2009, Armstrong was transported to the emergency department at Grady Memorial Hospital located in Atlanta, Georgia, after being shot in her upper back between the scapula (shoulder blade) and the spinal column. T. 250 and 252.  Upon initial examination Armstrong was found to be suffering from a very rapid

heart rate of 170 beats per minute (tachycardia)[11]

accompanied by a "decreased level of consciousness. Tr.

250. Armstrong was rated a 7 on the Glasgow Coma Scale.[11]

Tr. 265.  Her blood pressure was 133/93, respirations

---

11.  Tachycardia is a heart rate above 100 beats per
minute.  Dorland's Illustrated Medical Dictionary, 1850
(32nd Ed. 2012).

11.  Glasgow Coma Scale is "a quick, practical
standardized system for assessing the degree of
consciousness in the critically ill and for predicting
the duration and ultimate outcome of coma, primarily in
patients with head injuries. The system involves eye
opening, verbal response, and motor response, all of
which are evaluated independently according to a rank
order that indicates the level of consciousness and
degree of dysfunction. The degree of consciousness is
assessed numerically by the best response. The results
may be plotted on a graph to provide a visual
representation of the improvement, stability, or
deterioration of a patient's level of consciousness,
which is crucial to predicting the eventual outcome of
coma. The sum of the numeric values for each parameter
can also be used as an overall objective measurement,
with 15 indicative of no impairment, 3 compatible with
brain death, and 7 usually accepted as a state of coma.
The test score can also function as an indicator for
certain diagnostic tests or treatments, such as the
need for a computed tomography scan, intracranial
pressure monitoring, and intubation. The scale has a
high degree of consistency even when used by staff with
varied experience." Mosby's Medical Dictionary,___, 8th
edition. 2009.

were 34[12] and her blood oxygen level was 79 percent.[13] Tr.

255. Armstrong was observed to have a wound in the left

upper back and "found to have a left hemopneumothorax

[an accumulation of blood in the pleural cavity][14] for

--------------------

12.  The normal breathing rate ranges from 8 to 20
breaths per minute. Rapid shallow breathing,
MedlinePlus, U.S. National Library of Medicine,
National Institutes of Health, http://www.
nlm.nih.gov/medlineplus/ency/article/007198.htm (Last
accessed October 13, 2014); Vital Signs, The University
of Chicago Medicine, http://www.uchospitals.edu/
online-library/content=P00253 (Last accessed October
13, 2014).

13.   A blood oxygen level below 90 percent is
considered abnormal. Hypoxemia (low blood oxygen),
Definition, Mayo Clinic Staff,http://www.mayoclinic.org
/symptoms/hypoxemia/basics/definition/SYM-20050930
(Last accessed October 13, 2014).

14.  "The pleural cavity is the space that lies between
the pleura, the two thin membranes that line and
surround the lungs.  The pleural cavity contains a
small amount of a thin fluid known as pleural fluid,
which provides lubrication as the lungs expand and
contract during respiration. If an excess amount of
fluid is formed in the pleural cavity, a pleural
effusion may develop." Lynne Eldridge, M.D.,Pleural
Cavity, About Health, http://lungcancer.about.com/od/
glossary/g/Pleural-Cavity.htm (last accessed October
14, 2014).

which a chest tube was placed" and autotransfusion[15] was commenced. Tr. 250 and 255-256. X-rays revealed numerous bullet fragments in the left chest. Tr. 258. Armstrong remained in tachycardia and became hypotensive[16] and was noted to be in Class IV hemorrhagic shock.[17] Tr. 250, 259 and 269. Armstrong remained in tachycardia and hypotensive and was transferred by the emergency room trauma team to the operating room on a cardiac monitor to address uncontrolled bleeding and her unstable vital signs. Tr. 259.

In the operating room, Armstrong underwent a left anterolateral thoracotomy (an incision into the

---

15. Autotransfusion is the collecting and reinfusing blood which has been lost from clean wounds. See Dorland's Illustrated Medical Dictionary, 183 (32nd Ed. 2012).

16. Hypotension is low blood pressure.

17. Class IV hemorrhagic shock involve loss of greater than 40% of circulating blood volume. Hypovolemic/ Hemorrhagic Shock, Nursing Central, http://nursing. unboundmedicine.com/nursingcentral/ub/view/Diseases-and -Disorders/73631/all/hypovolemic_hemorrhagic_shock (Last accessed October 10, 2014). It was reported that Armstrong lost 2 liters of circulating blood. Tr. 269.

left chest wall on the front and to the side to examine the lung), partial wedge resection (the removal of a wedge-shaped portion) of the left upper lobe of the lung utilizing a surgical stapler and digital occlusion of the aorta in an attempt to stop the bleeding and a massive air leak, and placement of two chest tubes on the left side. Tr. 250 and 681-682. The resection of the left upper lobe was successful in slowing the bleeding and air leak. <u>Id.</u> At this point, the aortic occlusion was released[18] and sutures were applied. Once it was determined there was no further surgical bleeding, Armstrong's chest was closed and she was transferred to the intensive care unit (ICU). <u>Id.</u>

Armstrong's ICU course was complicated with a prolonged intubation.[19] Tr. 250. Armstrong returned to

---

18. During the surgery an aortic cross clamp, a surgical instrument, was utilized to stop the flow of blood from the heart. Tr. 250.

19. Intubation is the use of a tube either through the nose or mouth into the airway so that the patient can be placed on a ventilator to assist with breathing. Endotracheal Intubation, MedlinePlus, U.S. Library of
(continued...)

the operating room on June 23, 2009, for a tracheotomy, an esophagogastroduodenoscopy and the insertion of a feeding tube because of respiratory failure and dysphagia (difficulty swallowing). Tr. 250 and 672. She subsequently developed pleural effusion, pneumonia, bacteremia, and a urinary tract infection, and at one point, also failed a tracheotomy collar and had to be returned to a ventilator. Tr. 250.  Armstrong's mental status waxed and waned during her hospital stay and there was concern that she suffered an anoxic brain injury.[20] Tr. 250 and 341. Armstrong's bacteremia and pneumonia were treated with antibiotics and she

---

19.  (...continued)
Medicine, National Institutes of Health,
http://www.nlm.nih.gov/medlineplus/ency/article/003449.
htm (Last accessed October 14, 2014).

20.  Anoxic brain injury is caused by lack of oxygen going to the brain. The brain begins losing brain cells after only four minutes without oxygen. See The Brain's Dependence on Oxygen, BrainandSpinalCord.org, http://www.brainandspinalcord.org/traumatic-brain-injur y-types/anoxic-brain-injury/index.html (Last accessed October 14, 2014).

eventually had a successful extubation and was transferred to the surgical floor. Tr. 250.

Armstrong underwent a third surgery on July 7, 2009, a left thoracotomy, partial decortication of the left lung and fiberoptic bronchoscopy because she developed an abnormal collection of fluid in the pleural space and a "thick PEA."[21] Tr. 252 and 665-666.

Armstrong during her hospitalization received aggressive physical and occupational therapy and her mental status improved. Tr. 250. She finished her antibiotic regimen and became stable for transfer to a rehabilitation facility, Crestview Nursing Home, also located in Atlanta, Georgia. Tr. 252.  At the time of

---

21. "PEA" is an abbreviation for post-extubation atelectasis. Atelectasis is defined as "incomplete expansion of a lung or a portion of a lung[.]" Dorland's Illustrated Medical Dictionary, 171 (32nd Ed. 2012). Decortication is "a surgical procedure that removes a restrictive layer of fibrous tissue overlying the lung, chest wall and diaphragm.  The aim of decortication is to remove this layer and allow the lung to reexpand." Decorticatin, Overview, http://emedicine.medscape.com/article/1970123-overview (Last accessed October 13, 2014).

discharge from Grady Memorial Hospital on August 7,
2009, to Crestview Nursing Home, Armstrong was alert and
oriented to person, place, and time and "fully aware of
what was going on." Tr. 250 and 252.  Her discharge
medications, included Seroquel[22] and Percocet.[23] Tr. 252.

At Crestview Nursing Home, Armstrong continued
to receive physical and occupational therapy and
treatment for depression. Tr. 750-751 and 753-758. On
August 20, 2009, it was reported that Armstrong
participated well in her activities of daily living and
"only required limited assistance from staff" but that
she had some weakness in her left side and was "not able

---

22. Seroquel "is an antipsychotic medicine . . . used
to treat schizophrenia . . . [and] bipolar disorder
(manic depression) in adults . . . It is also used
together with antidepressant medications to treat major
depressive disorder in adults." Seroquel, Drugs.com,
http://www.drugs.com/seroquel.html (Last accessed
October 16, 2014).

23. Percocet "contains a combination of acetaminophen
and oxycodone. Oxycodone is an opioid pain medication.
An opioid is sometimes called a narcotic.
Acetaminophen is a less potent pain reliever that
increases the effects of oxycodone." Percocet,
Drugs.com, http://www.drugs.com/percocet.html (Last
accessed October 16, 2014).

to functionally ambulate[.]" Tr. 759.  The record
reveals that Armstrong was discharged from Crestview
Nursing Home on September 18, 2009. Tr. 760.  She
departed the facility with the assistance of a cane; and
indicated that she was moving to her mother's house in
Wilkes-Barre, Pennsylvania.[24] Tr. 768.  At the time of
discharge, her medications included an unspecified
narcotic pain medication.[25] Tr. 764. On September 21,
2009, Crestview Nursing Home verified that Armstrong had
moved to Pennsylvania. Tr. 770.

On September 25, 2009, Armstrong commenced
receiving counseling from Thomas Tomkiewicz, MSW, a
social worker at Catholic Social Services of the Diocese

---

24.  Many of the records from Crestview Nursing Home are
handwritten and difficult to decipher. Some of them
also appear to have been completed or at least signed
after Armstrong was discharged from the facility. Tr.
761-763.

25.  The nurse's notes for September 18, 2009, state in
part "all medications given including narcotic[.]" Tr.
764. A discharge instruction sheet states that
Armstrong's medication were aspirin, the stool softener
docusate sodium, the high blood pressure medication
metroprolol and the stomach acid reducer Nexium used to
treat gastroesophageal reflux disease. Tr. 768.

of Scranton. Tr. 786-791 and 879. Armstrong appeared at the appointment 15 minutes late and Mr. Tomkiewicz met with Armstrong for more than one hour. Tr. 786.  Mr. Tomkiewicz noted that Armstrong appeared to have a "slight time delay in mental processing both in terms of input and output functions (much as one would see with a person who has suffered a traumatic brain injury)" but that she was alert and oriented and her recent and remote memory were intact. Id.  During the session Armstrong described the circumstances of her shooting, her subsequent medical treatment and her current medical problems. Tr. 786-788. When asked if she had any specific concerns she wanted addressed Armstrong indicated that she did not. Tr. 789.  Mr. Tomkiewicz noted that Armstrong

> obviously benefited from her physical and
> occupational therapy, as she is now able to
> ambulate independently using a cane or by
> guiding herself along a wall. She has some
> weakness in her left leg and left arm, but does
> have some volitional movement in the fingers and
> wrists. She lacks fine motor coordination . . .
> Balance is fair, and her perception is
> questionable.

26

Tr. 788. After the session, Mr. Tomkiewicz met Armstrong's mother in the elevator and he suggested that they go to the basement so that Armstrong could exit the building using the ramp as opposed to the stairs from the first floor. Id.  In response to that suggestion, Armstrong's mother stated that she had her daughter "to the Social Security Building and that she had negotiated the steep stairs there without any problem." Id.  Mr. Tomkiewicz subsequently observed that Armstrong "almost accidently walked off a landing while exiting the building."  Tr. 788.

Mr. Tomkiewicz reported that Armstrong appeared to have reconciled herself to the fact that she would never be able to resume her former lifestyle and job and opined that Armstrong was disabled and eligible for Social Security disability or supplemental security income benefits given the severity of her injuries and functional limitations. Tr. 789. He further opined that "[g]iven the fact that she has been out of her rehab less than 5 days and is so independent and that she has

27

regained most of her function in such a short time our
clinical experience would suggest that she will continue
to see slow steady improvement over time" but further
indicated that he was amazed at Armstrong's "blase
attitude toward the shooting itself." Tr. 790.  As for a
prognosis Mr. Tomkiewicz stated that, "[b]ased on her
progress to date and her very survival, we would have to
believe that it will be quite good." Tr. 791.

On September 28, 2009, Armstrong had an
appointment with Maureen Lichtman, M.D., at Wyoming
Valley Family Practice, for a general physical and to
have a form filled out for disability in order to obtain
medical assistance. Tr. 777-780.  Armstrong reported
that she was not presently using any illicit drugs but
that she was using marijuana and consuming alcoholic
beverages prior to the shooting in June. Tr. 778.  A
physical examination revealed that Armstrong had
decreased range of motion of the left shoulder in all
directions limited by pain; she had a positive empty can

test;[26] she had normal muscle strength in the lower
extremities and the right upper extremity; she had
reduced muscle strength in the left upper extremity; and
she walked with a cane. Tr. 779.  Dr. Litchman completed
the medical assistance form indicating Armstrong was
disabled for 6 months, referred her to physical and
occupational therapy and prescribed medications,
including Seroquel and Percocet. Tr. 779-780.

On October 1, 2009, Armstrong had a second
counseling session with Mr. Tomkiewicz which lasted for
90 minutes. Tr. 792-795. Mr. Tomkiewicz reported that
Armstrong was more "sponstaneous in her interactions"
and complained "that her mother [] imposed a 7:00 p.m.
curfew on her which she [felt] was ridiculous since the

---

26.  The empty can test is used to determine whether a
patient has suffered a shoulder injury. The patient
holds out the affected arm with the elbow extended and
the thumb pointing downward. The examiner then pushes
down on the extended arm and patient tries to resist.
Pain or weakness is a positive test. See Do You Have a
Rotator Cuff Tear?, about health, http://physical
therapy.about.com/od/orthopedicsandpt/ss/Do-You-Have-a-
Rotator-Cuff-Tear_2.htm (Last accessed October 14,
2014).

only place she goes at night is to her brother's home []
in Wilkes-Barre." Tr. 792. Armstrong reported "looking
forward to beginning [physical therapy] and
[occupational therapy]." Id.  Mr. Tomkiewicz observed
that Armstrong's gait appeared steadier and that she
merely carried her cane but that the weakness in her
left arm remained "rather severe." Id.  Mr. Tomkiewicz
stated that Armstrong could manipulate a coin on a flat
surface utilizing her thumb and first digit and pick it
up with some difficulty by positioning the coin against
her chest but that the remaining three fingers were
"poorly responsive to volitional commands."[27] Id.  Mr.
Tomkiewicz observed that Armstrong had "a marked
difference in the strength of her right hand vs. her
left hand, and she [could] not elevate, rotate, adduct,
or abduct[28] the arm itself without assistance of her

27. In describing Armstrong's difficulty manipulating a
coin, Mr. Tomkiewicz did not indicating whether it was
the left or the right or both hands that were effected.

28. Adduction is movement toward or beyond the midline
of the body in the frontal plane; abduction is movement
(continued...)

30

right arm." Id.  Mr. Tomkiewicz indicated that Armstrong
appeared mildly interested in occupational and
vocational rehabilitation services. Tr. 793. Mr.
Tomkiewicz also reported that Armstrong stated that if
she regained more use of the left arm she would like to
work as a beautician; however, Mr. Tomkiewicz also noted
that Armstrong did not seem in a great hurry to do so.
Id.  Mr. Tomkiewicz "remained in a quandary about the
reason for [Armstrong's] sessions" with him but
hypothesized that she "may have had a propensity to make
'bad decisions' for a long time and that her mom [was]
hoping that [the social workers could] use this 'golden
moment' to make some life-altering changes in her
behavior and outlook." Tr. 795.

     At a third session with Mr. Tomkiewicz on
October 8, 2009, Armstrong "wore a cap and seemed a bit
be-draggled as it was raining rather heavy outside" and

---

28.  (...continued)
of a body part away from the midline of the body. See
Dorland's Illustrated Medical Dictionary, 2 & 26 (32nd
Ed. 2012).

her affect "seemed a lot more somber, and her mood was serious and depressed," which was in contrast to her mood during the first two counseling sessions. Id. Armstrong had "more problems with voice volume and dysarthria[29] and Mr. Tomkiewicz had to have her speak up and repeat herself several times during the session so that he could comprehend what she was saying. Tr. 796. Armstrong appeared upset about an upcoming psychological evaluation because she did not think there was anything wrong with her mentally and that her problems were physical. Id. Armstrong appeared confused and perplexed about paperwork that had to be completed to obtain medical assistance, food stamps, and cash assistance. Id. Mr. Tomkiewicz agreed to contact the public welfare department for her. Tr. 799. When Mr. Tomkiewicz contacted that agency, he was informed that Armstrong

---

29. Dysarthria is defined as "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system." Dorland's Illustrated Medical Dictionary, 575 (32nd Ed. 2012).

had been approved for medical assistance and food stamps but that they were still waiting for a form from the Delaware County Probation Office and that it would be necessary to complete a new welfare application specifically for cash assistance. Id.  Ms. DelGaudio, the individual Mr. Tomkiewicz spoke to at the public welfare office, "seemed baffled that [Armstrong] had gotten confused with what she had told her" and when Mr. Tomkiewicz subsequently spoke to Armstrong, she "seemed totally unaware of what had been told to her at the DPW office!" Id.

On October 14, 2009, Mr. Tomkiewicz sent a letter to the Bureau of Disability Determination delineating Armstrong physical and mental problems. Tr. 782-784.  Mr. Tomkiewicz reported that, although she had made a dramatic recovery, Armstrong still had difficulties which hampered her day-to-day life. Tr. 783. Mr. Tomkiewicz reported that Armstrong had poor voice volume and some dysarthria; she had weakness in her extremities on the left side; she had poor

coordination and markedly diminished strength; she was unable to elevate, adduct, or abduct the left arm unassisted; she could grasp objects from a flat surface with her thumb and 2nd finger but with considerable difficulty; she required moderate assistance to rise from a seated position; she had a significant delay in processing and responding to questions; and she seemed to have "a rather child-like, lackadaisical awareness of the severity of the injuries she has sustained and of her own current diminished level of functioning." Id. Armstrong would report that she was able to dress herself but Mr. Tomkiewicz noted that he had to help her put on and take off her coat and sweater. Id. Mr. Tomkiewicz reported that Armstrong had "considerable left-sided neglect such as one often observes with folks who have suffered an injury to the right side of the brain" and that "on two occasions [social workers] had to physically avert [Armstrong] from walking off a flight of stairs which she failed to notice." Id.  In

the penultimate paragraph of the letter Mr. Tomkiewicz

stated as follows:

> It is my clinical impression that [Armstrong] has suffered a brain injury contemporaneously with the trauma to her left thorax which has causes the left hemiparesis,[30] speech impairment, visual perception problems, cognitive processing delay as well as some moderate amount of emotional impairment.  At the present, she requires assistance with all [activities of daily living] and would appear to be physically incapable of doing any type of work for any sustained period of time. While she has no doubt made a substantial recovery from the injuries she sustained, the potential for continued improvement is difficult to gauge at this time.

Tr. 784.

On October 27, 2009, William F. Anzalone, Jr.,

Psy.D., a licensed psychologist, evaluated Armstrong on

behalf of the Bureau of Disability Determination. Tr.

823-829.  After conducting a clinical interview and

mental status examination, Dr. Anzalone concluded that

Armstrong suffered from depressive disorder, not

---

30. Hemiparesis is defined as "muscular weakness or partial paralysis affecting one side of the body." Dorland's Illustrated Medical Dictionary, 837 (32nd Ed. 2012).

otherwise specified, and that she had a fair prognosis.
Tr. 826. The mental status examination revealed nothing
unusual regarding her appearance, speech, perception,
impulse control, judgment, and reliability of the
information she provided. Tr. 824-826. Her mood was
depressed and affect appropriate. Id.  With regard to
her thought process, her responses to Dr. Anzalone's
questions were appropriate and goal directed but she
demonstrated mild impairments in respect to her sense of
information throughout the evaluation and her abstract
reasoning was restricted. Tr. 825. Her past and recent
memories were intact but her immediate memory and
delayed recall were mildly impaired. Id. Her insight
into her current situation appeared slightly impaired.
Tr. 826. Dr. Anzalone reported that Armstrong walked
"gingerly with a cane due to her gunshot wound but was
able to slowly walk up three flights of stairs with
assistance" and "[s]he required assistance with removing
her jacket due to her left arm being partially
paralyzed." Tr. 825. Dr. Anzalone also reported that

36

Armstrong had mild to moderate difficulties with concentration, persistence, or pace. Tr. 829. Dr. Anzalone recommended that Armstrong continue with physical and occupational therapy. Tr. 826.

On November 11, 2009, Dr. Anzalone completed a form titled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" in which he stated that Armstrong had no limitations in understanding, remembering, and carrying out short, simple instructions; moderate limitations in understanding, remembering, and carrying out detailed instructions and in making judgments on simple work-related decisions; and no limitations in responding appropriately to supervision, coworkers, or work pressures. Tr. 820. When asked if there were any other capabilities affected by Armstrong's condition, Dr. Anzalone stated that Armstrong had a marked limitation[31] with respect to

---

31. Marked was defined in the document as follows: "There is serious limitation in this area. The ability to function is severely limited but not precluded." Tr. 819.

mobility and gait and that she suffered from partial
paralysis on the left side of her body and required
assistance with walking and balance. Tr. 821.

On November 13, 2009, John J. Chiampi, Ph.D., a
state agency psychologist, reviewed Armstrong's medical
records and concluded that Armstrong suffered from a
depressive disorder and coexisting nonmental impairments
that required referral to another medical specialty. Tr.
805.  According to Dr. Chiampi who merely did a records
review, Armstrong's depressive disorder caused no more
than moderate mental functional limitations and she had
the ability "to meet the basic mental demands of
competitive work on a sustained basis despite the
limitations resulting from her impairment. Tr. 802-803.

On February 17, 2010, Armstrong was examined by
Vincent A. Drapiewski, M.D., on behalf of the Bureau of
Disability Determination. Tr. 871-878. After conducting
a clinical interview and physical examination, Dr.
Drapiewski reported that Armstrong had no ability to
lift with her left arm and any lifting was limited to

38

her right arm but he did not specify the amount of weight. Tr. 878. Dr. Drapiewski indicated that Armstrong needed a hand-held assistive device to ambulate but did not specify the number of hours Armstrong could stand and walk, and he did not specify the number of hours she could sit during an 8-hour workday. Id. Dr. Drapiewski further stated that Armstrong could frequently bend; occasionally kneel, stoop, and crouch; and never balance or climb. Tr. 877. Dr. Drapiewski reported that Armstrong's left hand was very clumsy and her grip weak; she had "contractures involving the fourth and fifth fingers of the left hand with the fifth finger more highly involved"; and she appeared "to have a neurological deficit involving her left arm, which possibly at least could reflect a brachial plexopathy."[32]  Tr. 873.

---

32. Brachial plexopathy is "pain, decreased movement, or decreased sensation in the arm and shoulder due to a nerve problem. . . It occurs when there is damage to the brachial plexus, an area on each side of the neck where nerve roots from the spinal cord splits into each arm's nerves." Brachial plexopathy, A.D.A.M. Medical

(continued...)

On March 3, 2010, Vinaykant M. Shah, M.D., a state agency physician, reviewed Armstrong's medical records and opined that 12 months after the alleged disability onset date Armstrong's condition would improve and she would have the physical ability to perform the full-range of light work. Tr. 863-867. He indicated that Armstrong would be unlimited with respect to pushing and pulling and imposed no postural (such as climbing and balancing), manipulative (such as reaching in all direction and fingering), visual, communicative or environmental limitations (such as working at heights). Id.

On April 27, 2010, Mr. Tomkiewicz sent a letter to the Social Security Administration in which he reported that he had regular counseling sessions with Armstrong since September 2009, and that he would be assisting Armstrong at her administrative hearing. Tr.

---

32.  (...continued)
Encyclopedia, PubMed Health, U.S. National Library of Medicine,http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH00 02391/ (Last accessed October 15, 2014).

879-880. He noted that, in October, 2009, he had seen Armstrong on only three occasions but, since then, he had been meeting with Armstrong "almost every week" and that he "had a much better opportunity to assess her abilities and her incapacities."[33] Tr. 879. Mr. Tomkiewicz reported that Armstrong's left arm, hand and fingers remained paretic (partially paralyzed); that Armstrong had difficulty moving her fingers to grasp objects or put on or remove clothing; that Armstrong could not raise her arm, pull it to her torso, or move it away from her body without using her right arm to help; that Armstrong's left leg remained weak and she was unable to get up from a sitting position without assistance; that Armstrong was unable to stand unsupported for more than a moment or two and that she would lose her balance frequently; that Armstrong tended to neglect the left side of her body and when ambulating

---

33.  The administrative law judge was aware of this letter and took no steps prior to or after the administrative hearing to obtain Mr. Tomkiewicz's notes of the weekly counseling sessions.

had several "near-miss" accidents; that Armstrong became short of breath with nominal exertion and that her voice was weak making her speech difficult to comprehend most of the time; and that Armstrong had little or no awareness of either the extent of her disability or how much help she required. Tr. 880.  Mr. Tomkiewicz further opined, based on his 42-plus year career as a social worker in a general hospital setting and his counseling sessions with Armstrong for an additional seven months, that Armstrong had reached "a plateau where little of no more physical/psychological improvement is possible" and that Armstrong was not capable of gainful employment. Id.  Mr. Tomkiewicz recommended that Armstrong be "evaluated by a physiatrist (a specialist in rehab medicine) in order to refute or to corroborate [his] evaluation." Id.

On September 28, 2010, Armstrong was examined by John Kline, M.D., a physiatrist, at the Northeastern Rehabilitation Associates, P.C., located in Wilkes-Barre. Tr. 882-884. A physical examination revealed that

Armstrong had weakness in the left upper extremity but
had normal range of motion; that Armstrong had fairly
good balance with ambulation but a mildly positive
Romberg test;[34] that Armstrong had tenderness in the
medial joint line of both knees; and that Armstrong had
difficulty squatting. After conducting a clinical
interview, physical examination, and reviewing multiple
medical records, Dr. Kline's impression was that
Armstrong suffered from (1) left posterior thoracic pain
with pleuritic pain secondary to gunshot wound, (2) left
acromioclavicular tear, (3) probable traumatic bilateral
knee degenerative osteoarthritis as well as ankle

---

34.  The Romberg Test is used to diagnose "sensory
ataxia, a gait disturbance cause by abnormal
proprioception involving information about the location
of the joints."  Romberg Test, Physiopedia,
http://www.physio-pedia.com/Romberg_Test (Last accessed
October 14, 2014).  Ataxia is defined as "failure of
muscular coordination; irregularity of muscular
action." Dorland's Illustrated Medical Dictionary, 170
(32nd Ed. 2012). Proprioception is defined as the sense
of how your limbs are oriented in space. Definition
of Proprioception, MedincineNet.com, http://www.
medicinenet.com/script/main/art.asp?articlekey=6393
(Last accessed October 14, 2014).

degenerative osteoarthritis, (4) balance difficulty, and
(5) probable left upper extremity brachial plexopathy.
Tr. 883.  Dr. Kline referred Armstrong to physical and
aquatic therapy at John Heinz Institute of
Rehabilitation Medicine (John Heinz Institute);
prescribed medications including the narcotic-like pain
medication Ultram; ordered an x-ray of both knees as
well as the thoracic cavity; and provided her with
Voltaren gel to be applied to her knees. Id.

From September 30, 2010 through January 7, 2011,
Armstrong attended 26 physical therapy sessions and,
from October 20, 2010 through February 18, 2011, she
attended 25 occupational therapy sessions at John Heinz
Institute. Tr. 889, 910 and 969.  The initial physical
therapy evaluation from September 30, 2010, reveals that
Armstrong had muscular weakness in the left side of her
body with the upper extremity being worse than the lower
extremity. Tr. 893.  The weakness primarily, however,
was in her shoulder muscles with a rating as low as

44

2+/5.[35] Id.  Also, at the initial physical therapy
evaluation Armstrong's balance was evaluated using the
Berg Balance Scale (BBS). Tr. 894-896. Armstrong was
given a total score of 24 out of 56, representing that
she could only walk with assistance and was at risk for
falling.[36] Tr. 896. On October 29, 2010, Armstrong's BBS

---

35.  2/5 is a muscle strength rating assigned when a
patient's muscle can contract but cannot move the body
part fully against gravity. 3/5 is a muscle strength
rating indicating that the patient is able to fully
contract the muscle and move the body part through its
full range of motion against the force of gravity but
when resistance is applied the muscle is unable to
maintain contraction. Muscle Strength Measurement,
about health, http://physicaltherapy.about.com/od/
orthopedicsandpt/a/strengthmeasurement.htm (Last
accessed October 15, 2014).

36.  "The Berg balance scale is used to objectively
determine a patient's ability (inability) to safely
balance during a series of predetermined tasks.  It is
a 14 item list with each item consisting of a five-
point ordinal scale ranging from 0 to 4, with 0
indicating the lowest level of function and 4 the
highest level of function and takes approximately 20
minutes to complete. It does not include the assessment
of gait." Berg Balance Scale, Physiopedia, http://
www.physio-pedia.com/Berg_Balance_Scale (Last accessed
October 15, 2014). The highest total score is 56 and a
score of less than 45 indicates a risk for falling.
Functional Mobility and Balance Outcome Measurements,
about health, http://physicaltherapy.about.com/od/
(continued...)

score was 27; on December 8, 2010, it was 36; and on
January 7, 2011, it was 38. Tr. 903, 908 and 913.

At the initial occupation therapy session on
October 20, 2010, it was reported with respect to
Armstrong's coordination as follows:

> Difficulty manipulating pegs from 9 hole
> peg test. Required 4 minutes and 7 sec to
> place and remove 3 pegs from test.  Used
> primarily a key pinch pattern. Unable to
> manipulate the pegs in left hand. Compensated
> greatly with shoulder and body to place
> pegs. Unable to manipulate objects such as
> utensils and coins [with left] hand.

Tr. 954.  It was also reported with respect to
Armstrong's shoulder range of motion that she was unable
to reach behind her head or back with her left hand. Tr.
955. Subsequent occupational therapy records revealed

---

36.  (...continued)
Physical-Therapy-For-Seniors/tp/Mobility-And-Balance-Ou
tcome-Measurements.htm (Last accessed October 15,
2014). One source indicates that patients with scores
of 21-40 can only walk with assistance and patients
with scores of less than 40 are almost 12 time more
likely to fall than those with scores higher than 40.
Berg Balance Scale, http://cfm.mc.duke.edu/wysiwyg/
downloads/stu_hndout_Berg_Balance_Scale_Explan__gait_7.
09.pdf (Last accessed October 15, 2014).

that her ability to reach behind her back improved. Tr.
963, 966 and 970.

On January 12, 2011, Armstrong had an
appointment with Dr. Kline for a physiatric
reevaluation. Tr. 885-886.  Dr. Kline reported that
Armstrong at the prior appointment demonstrated
significant thoracic pain and shoulder discomfort from
the gunshot wound as well as difficulty with both knees
because of significant arthritis. Tr. 885.  He further
noted that Armstrong had been attending physical therapy
and continued to take the narcotic Percocet which was
prescribed by her family physician. Id.  A physical
examination revealed that Armstrong suffered from
dysmetria,[37] ataxia,[38] tenderness over the medial joint

37. Dysmetria is defined as "a condition in which there
is improper estimation of distance in muscular acts,
with disturbance of the power to control the range of
muscular movement, often in overreaching." Dorland's
Illustrated Medical Dictionary, 578 (32nd Ed. 2012).

38. Ataxic (or atactic) is defined as "lacking
coordination; irregular; pertaining to or characterized
by ataxia." Dorland's Illustrated Medical Dictionary,
170 (32nd  Ed. 2012). Ataxia is defined as "failure of
(continued...)

line of both knees, and some discomfort over the ankles.
Tr. 885-886. She also had a positive McMurray's test
bilaterally.[39] Tr. 886. Dr. Kline's impression was that
Armstrong suffered from posterior thoracic pain with
pleuritic pain secondary to the gunshot wound, left
acromioclavicular tear,[40] probable traumatic bilateral
knee degenerative osteoarthritis as well as ankle
arthritis, balance difficulty and ataxia, and probable

_____

38. (...continued)
muscular coordination; irregularity of muscular
action." Id.

39. Between the thighbone and the shinbone are two
rings of cartilage called menisci which provide
stability and cushion the knee joint, acting as shock
absorbers. The McMurray's test or sign is to determine
whether there is a meniscal tear. See Dorland's
Illustrated Medical Dictionary, 1894 (32nd Ed. 2012).

40. "Acromioclavicular joint injuries are often seen
after bicycle wrecks, contact sports, and car
accidents. The acromioclavicular joint is located at
the top of the shoulder where the acromion process [the
highest point of the shoulder blade] and the clavicle
[collar bone] meet to form a joint[]. Several ligaments
surround this joint, and depending on the severity of
the injury, a person may tear one or all of the
ligaments." Acromioclavicular Joint Injury, Medscape,
http://emedicine.medscape.com/article/92337-overview
(Last accessed October 15, 2014).

left upper extremity brachial plexopathy. Id.  He
ordered an MRI of the left shoulder and prescribed pain
medications, including Ultram. Id.

On January 28, 2011, Armstrong had a series of
chest x-rays performed which revealed "numerous metallic
density bullet fragments superimposed over the upper
chest. Tr. 887. Most of the fragments "appear[ed] to be
superficial in the back although several" were possibly
"intrathoracic." Id.  Armstrong also underwent an MRI of
the left shoulder which was limited as result of a
"[m]ild artifact . . . probably . . . related to
metallic density bullet fragments." Id.  There was,
however, no evidence of a rotator cuff tear and the
acromioclavicular joint appeared normal. Id.

On February 18, 2011, Armstrong had her 25th
occupational therapy session. Tr. 973.  The record of
this session states that Armstrong continued to require
"[minimal assistance] occasionally for [upper extremity]
dressing depending on shirt style." Id.  Armstrong
reported improvement with grasping and gripping light

49

weight objects but weakness of her left hand limits her "holding heavy objects such as a full cup of water." <u>Id.</u> With respect to the occupational therapy goals it was stated that her grip strength had increased but that the other goals had not been met. <u>Id.</u>

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Armstrong had not engaged in substantial gainful work activity from June 14, 2009 through June 14, 2010. Tr. 33.

At step two of the sequential evaluation process, the administrative law judge found that, through the date of his decision, Armstrong had the following severe impairments: "the residuals of a gunshot wound to the upper left back, anemia, arthritis, obesity,[41] and depressive disorder." <u>Id.</u>

---

41. The record reveals that Armstrong weighed 222 pounds and is 5' 6" tall. Tr. 872. An individual of such height and weight has a body mass index of 35.8 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bm

(continued...)

At step three of the sequential evaluation process, the administrative law judge found that Armstrong's impairments through the date of his decision did not individually or in combination meet or equal a listed impairment. Tr. 33 and 37.

At step four of the sequential evaluation process, the administrative law judge found that Armstrong had no past relevant work experience and from June 14, 2009 through June 14, 2010, had the residual functional capacity to perform substantially less than the full range of sedentary work and, therefore, was disabled during that one-year period. Tr. 33-37.

Utilizing the sequential evaluation process outlined at 20 C.F.R. § 416.994, the administrative law judge determined that medical improvement occurred as of

_____

41.  (...continued)
i/english_bmi_calculator/bmi_calculator.html (Last accessed October 16, 2014). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed October 16, 2014).

June 15, 2010, which allowed Armstrong to engage in a
limited range of light work.[42] Tr. 39. Specifically, the
administrative law judge found that Armstrong had the
residual function capacity to perform light work which
was limited to simple, unskilled work with only
occasional handling with the left upper extremity. Id.
In finding that Armstrong improved on June 15, 2010, the
administrative law judge pointed to no medical records
occurring on or about that date which evidenced an
improvement.  The administrative law judge merely stated
as follows:

> The severity of the claimant's impairments
> decreased in terms of signs, symptoms, and/or
> laboratory findings. The claimant was shot. It
> was a significant injury for a few months but
> not enough to warrant ongoing disability beyond
> June 15, 2010, She still has some residual
> problems with her left arm, but that's
> really about it.

------------------------------------------------------------

42.  If an administrative law judge at any point finds a
claimant disabled, the administrative law judge must
also determine whether the disability continues through
the date of the decision. In making this determination,
the administrative law judge in SSI claims follows a
seven-step evaluation process (20 C.F.R. §
416.994(b)(5)(i)-(vii)).

Tr. 37.  The administrative law judge relied on the opinion of Dr. Shah, the state agency physician, that Armstrong would improve within 12 months from the alleged disability onset date and ignored the findings of Dr. Kline on January 12, 2011, that Armstrong suffered from dysmetria and ataxia as well as the physical therapy notes which indicated that Armstrong had an ongoing problem with balance after June 14, 2010. Tr. 40.  The administrative law judge imposed no other limitations with respect to Armstrong's need to use a hand-held assistive device, need to avoid overhead reaching, bending, stooping, climbing, fingering or grasping, or need to avoid heights or dangerous environments.

Based on the foregoing residual functional capacity of a limited range of light work, the administrative law judge found pursuant to the framework of Medical-Vocational Rule 202.20[43] that

_____

43.  Contained within the Social Security regulations are grids or tables which list Rules 201.01 through

(continued...)

43.   (...continued)
201.29 (for sedentary work), 202.01 through 202.22 (for
light work) and 203.01 through 203.31 (for medium work)
in the left hand column.  These grids or tables are
found at 20 C.F.R., Pt. 404, Subpt. P, App. 2.  The
Social Security regulations provide that "where the
findings of fact made with respect to a particular
individual's vocational factors and residual functional
capacity coincide with all of the criteria of a
particular rule, the rule directs a conclusion as to
whether the individual is or is not disabled." Rule
200.00.  In the right hand column of the grid or table
is set forth the "Decision" as to whether a claimant is
"disabled" or "not disabled. To apply the grids to deny
benefits, the individual must be able to perform the
full-range of exertional demands of a particular
category of work and have no non-exertional
limitations. Social Security Ruling (SSR) 83-12
provides, however, that where a functional limitation
is "so slight that it would clearly have little effect
on the occupational base" the administrative law judge
can rely on the Medical-Vocational Rules. This
exception only applies where the extent of erosion of
the occupation base is clear and where it is not clear
the administrative law judge will have to consult a
vocational resource, such as a vocational expert. SSR
83-12 further states as follows: "Experience with
person who have lost the use of an upper extremity has
shown that their potential occupational base is between
the occupational bases for [sedentary and light work].
While individuals with this impairment have been know
to perform selected occupations at nearly all
exertional levels, the total number of occupations
within their RFC's is less than the number represented
by a full or wide range of light work. These
individuals would generally not be expected to perform
sedentary work because most unskilled sedentary jobs
                                        (continued...)

Armstrong was not disabled commencing on June 15, 2014. Tr. 41.  The administrative law judge did not rely on the testimony of a vocational expert but stated that Armstrong's additional limitations, i.e., only occasional handling with the left upper extremity, "had little or no effect on the occupational base of unskilled light work" and, consequently, "there [was] work in significant numbers in the national economy" and concluded that Armstrong was not disabled.[44] Id.

------

43.  (...continued)
require good use of both hands. . .  Given an individual's particular RFC, a [vocational sources] will be able to determine the size of the remaining occupational base, cite specific jobs with the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country."

44.  The vocational expert did identify unskilled, sedentary positions which Armstrong could perform - video monitor, visual inspector and telephone clerk - but the hypothetical initially was for the full range of sedentary work with no additional functional limitations.  When the additional limitations of only occasional use of the left arm and hand were added, the telephone clerk position was eliminated and in its place the vocational expert substituted the position of information clerk. Tr. 64.  There was no indication
(continued...)

The court has thoroughly reviewed the 1001 pages comprising the administrative record Armstrong argues, inter alia, that the administrative law judge erred when he (1) failed to  adequately develop the record and (2) found that  medical improvement occurred on June 15, 2010, without pointing to any evidence that there was an appreciable improvement in her condition on that date. Those arguments have substantial merit.

Armstrong was not represented at the administrative hearing. As previously stated, an administrative law judge has a duty to assist an unrepresented claimant in developing the record.  As one court has correctly stated

> [a] proceeding will be marked by unfairness when the ALJ fails to exercise his or her duty to fully develop the record prior to making a disability determination. When a claimant is unrepresented in social security proceedings,

---

44.  (...continued)
that these positions would remain available if Armstrong had additional functional limitations as mentioned by Dr. Kline in his medical notes of January 12, 2011, and the occupational and physical therapy records of September 30, 2010 through February 18, 2011.

> the ALJ has a heightened duty to assist the
> claimant in developing a full and fair record.
> When a claimant appears at a hearing without
> counsel, the ALJ must scrupulously and
> conscientiously probe into, inquire of, and
> explore for all the relevant facts. The adequacy
> of an ALJ's investigation will be determined on
> a case-by-case basis. The essential inquiry is
> whether the incomplete record reveals
> evidentiary gaps [that] result in prejudice to
> the claimant.

Rosenberger v. Commissioner of Soc. Sec., 2009 WL

3124754 (W.D. Pa 2009)(citations and quotations marks

omitted).

At somepoint, the administrative law judge

became aware that Armstrong had recent medical treatment

and that there were other medical records that were not

submitted. While Armstrong came to the hearing with

additional medical records from John Heinz Institute,

the administrative law judge undertook no inquiry as to

whether there were other records that needed to be

updated.  There were no records submitted from

Armstrong's treating family physician other than the

record of the initial appointment with Dr. Lichtman on

September 28, 2009.  However, on January 12, 2011, Dr.

Kline noted that Armstrong continued to receive
prescriptions for Percocet from her family physician.
Tr. 885. The administrative law judge took no steps to
obtain the records from the treating family physician.
Moreover, in April 2010, Mr. Tomkiewicz noted that he
had been counseling Armstrong on at least a weekly basis
for seven months and the administrative law judge did
not take any steps to obtain those counseling records.

The administrative law judge's failure to
inquire about recent medical treatment is problematic
because he was aware that Armstrong had not reviewed her
Social Security file before the hearing and, therefore,
Armstrong was unaware of what medical records were in
the file that may need updating. Tr. 50-52.

The administrative law judge failed in his duty
to develop the record in other ways.  Specifically, the
administrative law judge did not assist Armstrong in
questioning the vocational expert, even after Armstrong
announced that she did not understand "nothing [the
Vocational Expert] said." Tr. 65.

Thus, the court concludes that the record was not adequately developed.  The administrative law judge was made aware of other medical records but failed to take steps to obtain those records and did not invite Armstrong to supplement the record.

There was no attempt by the administrative law judge to obtain an assessment from Armstrong's treating family physician or from Dr. Kline regarding Armstrong's physical functional abilities.  The administrative law judge had a responsibility to investigate the facts and develop the arguments both for and against granting benefits.  See Kinney v. Astrue, Civ. No. 10-104, slip op. at 52 (M.D. Pa. July 27, 2010)(Doc. 11)(Muir, J.). In this case, the ALJ did not fulfill his duty to ensure he issued a decision based upon a fully developed record.

The court has thoroughly reviewed the record and that review reveals that there is no medical evidence indicating that Armstrong had an appreciable improvement in her condition on or about June 15, 2010.  In fact,

after June 15, 2010, Armstrong continued to have a problem with her balance, coordination, and fine motor skills as evidence by Dr. Kline's records and the physical and occupational therapy records.  On January 12, 2011, Dr. Kline found that Armstrong suffered from dysmetria and ataxia.  This finding is at odds with the administrative law judge's assertion in his decision that on and after June 15, 2010, Armstrong "still has some residual problems with her left arm, but that's really about it." Tr. 37. That finding is not supported by substantial evidence in the record.  Dr. Shah's speculation that Armstrong would improve within 12 months of the disability onset date does not amount to substantial evidence, because such a finding must be based on a showing of an actual improvement in the medical condition on or about the date of improvement set by the administrative law judge. The court discerns no such evidence in this case and the date set by the administrative law judge for medical improvement appears to be completely arbitrary.

60

This court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the court will vacate the decision of the Commissioner and remand the case for further proceedings, pursuant to 42 U.S.C. § 405(g).

An appropriate order will be entered.


S/SYLVIA H. RAMBO
United States District Judge


Dated: October 24, 2014